## Brode, Appellant, *v.* Philadelphia.

*Constitutional law—Statutes—General rule as to constitutionality.*

1. An act of assembly is to be declared void only when it violates the constitution clearly, palpably, plainly, and in such manner as to leave no doubt or hesitation in the mind of the court passing upon its constitutionality.

*Constitutional law—Municipalities—Stock in corporations—Lending credit to corporations—Article IX, sec. 7, of the constitution—Act of April 15, 1907, P. L. 80—Contract between municipality and street railway company.*

2. The Act of April 15, 1907, P. L. 80, entitled, "An act authorizing contracts between cities, boroughs or townships, of the one part, and street passenger railway companies, surface, elevated or underground, or motor power companies, leasing and operating the franchises and property of such companies, of the other part, affecting, fixing and regulating the franchises, powers, duties and liabilities of such companies, the management of the same, the relations and respective rights of the contracting parties, and the ultimate acquisition by such cities, boroughs and townships, of the property, leaseholds and franchises of said contracting companies," does not violate art. IX, sec. 7, of the constitution of Pennsylvania, by which the general assembly is forbidden to "authorize any county, city, borough, township or incorporated district to become a stockholder in any company, association or corporation, or to obtain or appropriate money for, or to loan its credit to, any corporation, association, institution or individual."

3. There is nothing in the constitution which prohibits the general

assembly from empowering a municipality to contract for the payment to it by a street railway company, or motor power company, of fixed sums in lieu of the performance of certain duties, or of the payment of license fees or charges imposed in its favor by general law or ordinance, or by the charter of the leasing or operating company; nor is it violative of any constitutional provision to permit a municipality in making such a contract to provide for its own protection that it may select a certain number of persons to act as directors of the railway or motor power company in conjunction with the directors elected by the stockholders thereof.

4. The ordinance of the city of Philadelphia approved July 1, 1907, Phila. Ordinances, 153, and entitled, "An Ordinance authorizing the execution of a contract between the City of Philadelphia and the Philadelphia Rapid Transit Company, affecting, fixing and regulating the duties, powers, rights and liabilities of the City and of the Philadelphia Rapid Transit Company, and its subsidiary companies, and the relation and respective interests of the contracting parties, providing for the future management and extension of the street railway system controlled by the Philadelphia Rapid Transit Company, and the final acquisition of its leaseholds and property by the city, and repealing so much of former ordinances as is inconsistent herewith," is not unconstitutional, conforms to the Act of April 15, 1907, P. L. 80, and does not exceed the powers conferred by that act on the city, because the contract is with a motor power company operating some lines not within the city limits; nor does the ninth clause of the ordinance violate art. III, sec. 20, of the constitution as providing for a commission to invest the moneys of the city.

5. The ordinance of July 1, 1907, is a contract which the city councils themselves had power to make, and is not such a contract as requires the approval of the city solicitor under the first section of art. VIII of the Act of June 1, 1885, P. L. 37.

Mr. Justice Mestrezat dissents.

Argued Jan. 3, 1910. Appeal, No. 368, Jan. T., 1909, by plaintiff, from decree of C. P. No. 1, Phila. Co., Sept. T., 1908, No. 4362, dismissing bill in equity in case of Elmer E. Brode v. City of Philadelphia, John E. Reyburn, mayor of said city, Philadelphia Rapid Transit Company and Market Street Elevated Passenger Railway Company. Before Fell, C. J., Brown, Mestrezat, Potter, Elkin, Stewart and Moschzisker, JJ. Affirmed.

Bill in equity to annul a contract and to declare void

an ordinance of the city of Philadelphia dated July 1,
1907. The defendants demurred to the bill. Before
KINSEY, J.

The ordinance in question was as follows:

## "AN ORDINANCE

"Authorizing the execution of a contract between the
City of Philadelphia and the Philadelphia Rapid Transit
Company, affecting, fixing and regulating the duties,
powers, rights and liabilities of the City, and of the Phil-
adelphia Rapid Transit Company, and its subsidiary
companies, and the relations and respective interests of
the contracting parties, providing for the future manage-
ment and extension of the street railway system con-
trolled by the Philadelphia Rapid Transit Company, and
the final acquisition of its leaseholds and property by the
City, and repealing so much of former ordinances as is
inconsistent therewith.

"Section 1. The Select and Common Councils of the
City of Philadelphia do ordain, That the City of Phila-
delphia in accordance with the powers granted by the
Act of the General Assembly of Pennsylvania, approved
April 15th, 1907, P. L. 80, and entitled 'An Act author-
izing contracts between cities, boroughs or townships of
the one part, and street passenger railway companies,
surface, elevated or underground, or motor-power com-
panies leasing and operating the franchises and property
of such companies, of the other part, affecting, fixing and
regulating the franchises, powers, duties and liabilities
of such companies, the management of the same, the re-
lations and respective rights of the contracting parties,
and the ultimate acquisition by such cities, boroughs
and townships of the property, leaseholds and franchises
of said contracting companies,' as well as of all other
powers inherent in the City of Philadelphia shall enter
into a contract with the Philadelphia Rapid Transit
Company, owner, lessee and operator of various surface,
elevated and underground street railways in the City of

Philadelphia which shall be in the form following for the purpose of accomplishing the objects set out in the recitals and covenants therein contained: . . . .

"Sec. 2. The Mayor is hereby authorized and directed to execute, acknowledge and deliver the said contract on behalf of the City (which contract shall be recorded), and to fill in the blank left for the date in the above agreement.

"Sec. 3. The Ordinance entitled, 'An Ordinance to regulate passenger railways' approved July 7th, 1857, Phila. Ordinances, 248, together with all supplements thereto, and all other ordinances and parts of ordinances, and all contracts inconsistent herewith are hereby repealed, cancelled and annulled. This repeal to take effect only upon due execution and delivery by both parties of the contract provided for in the first section of this Ordinance."

The agreement was as follows:

"Agreement entered into this First day of July, one thousand, nine hundred and seven, between the City of Philadelphia of the one part (hereinafter called the City), and the Philadelphia Rapid Transit Company, of the other part (hereinafter called the Company).

"Whereas, Beginning about the year 1857 different companies to the number of upwards of fifty, incorporated by the Commonwealth of Pennsylvania, have been granted consent by the City to occupy various streets of the City for the purpose of transporting passengers from point to point along the same, which franchises and consents have been granted subject to various conditions and restrictions;

"And Whereas, These companies were subsequently leased for long terms of years by traction or motor-power companies, which have installed the electrical system of propulsion of cars, all of which leases have now, by assignments and various conveyances, become vested in the Company, which thus controls and operates as one general system practically all of the street passenger railway companies in the City of Philadelphia;

"And Whereas, The Company has also acquired through stock ownership and leases control of all the franchises which have been granted for the construction of elevated and underground passenger railways within the City and has under construction and in partial operation an elevated and underground railway from the western end of Market street along Market street to Delaware avenue, and also has franchises for the construction of a subway on Broad street and an elevated railway to Frankford;

"And Whereas, The terms, conditions, restrictions and liabilities which have been imposed upon these various companies (all of which shall be taken as included in the words 'subsidiary companies' wherever the same are hereinafter used) differ widely, and there is dispute and uncertainty with respect to the effect of many of the provisions thereof, and it is believed that it is to the interest of the public as well as of the parties hereto to supersede the former regulations, and to define and regulate the relations between the parties hereto so as to make them fixed, fair and uniform;

"And Whereas, The City should have a voice in the management of the Company and a supervision of its accounts and expenditures;

"And Whereas, A large sum of money is required to improve, complete and extend the present system of the Company in order that it shall better serve the public; and for this purpose it is essential that the position of the Company be clearly defined, and the securities of itself and its underlying properties unquestioned, and its rights to make extensions in the future assured, in order that it may obtain credit to finance the increased transit facilities so necessary for the welfare of the public and the development of the City;

"And Whereas, It is desirable that arrangements should be made requiring the direct payment into the City Treasury of a fixed sum in lieu of a license fee per car, and a further sum to represent the cost of maintain-

ing street pavements and caring for the streets occupied by passenger railway tracks, in order to enable the City to have control of this municipal work. And it is further desirable that provision should be made for the sharing by the City in the earnings of the Company from further growth of the City (without in any way making the City liable for any of the obligations of the Company), and the ultimate acquisition by the City of the leaseholds and property of the Company.

"Now, Therefore, In consideration of the covenants and undertakings herein on behalf of each party with the other, and the payments to be made by the Company to the City, and the readjustment by the City of the obligations of the Company, and the confirming of the rights and franchises of itself and its underlying companies under the conditions herein contained, it is covenanted and agreed between the parties hereto as follows:

"First.—The Company shall, by appropriate action within thirty (30) days after this contract is executed, make a call on its stockholders for the portion of its capital stock unpaid, which shall be made payable in installments of five (5) dollars each, the last of which shall be payable not later than December 31, 1908. All of the said fund shall be expended for the completion of improvements now undertaken, the providing of new lines, power and equipment. No further increase of capital stock or funded indebtedness (saving where the latter is by way of renewal or substitution of or for indebtedness now existing, or validly incurred hereafter under the provisions hereof) shall be made by the Company or any of its subsidiary companies at any time or for any purpose without the consent of the City, nor shall any further leases, obligations or guarantees be assumed by the Company at any time during the term of this agreement without such consent, nor shall the Company, during said term, part with any of the stocks, leaseholds or franchises without like consent. And there shall be stamped across the face of all certificates of stock and

leases held by the Company, notice that the same are held subject to the terms of this agreement, except securities held in the Fire Insurance Fund of the Company, which may be sold from time to time to meet fire losses or for the purpose of reinvestment.

"Second.—In case at any time hereafter the Company shall be desirous of making any additions to its existing system by the extension of old lines or the incorporation of new companies or any additions to its power or equipment, or any betterments to its lines, power or equipment, the expenditures for which require additional capital and are properly chargeable to capital account, it shall present a communication to Councils setting forth the necessity for such extensions, additions or betterments, together with the estimated and probable cost of the same, and a plan for raising the capital necessary to cover the expenditures required for the purpose; but no such plan shall be effective, nor shall the Company make any issues of stock or bonds, or incur any guarantees or liability for the purpose of carrying out said plan until the same shall receive the approval of the City.

"Third.—In case at any time in the future Councils shall either of its own initiative or upon petition of any of the citizens, determine that new lines of surface, elevated or underground railway should be constructed within the City, it shall, by ordinance, determine the route of such line, and the terms and conditions under which it shall be built, financed and operated, and the Company shall have ninety (90) days after the passage of such ordinance to take such corporate action as may be necessary to accept the same, certified copies of which action shall be duly filed with the Mayor within said period of ninety (90) days; but if the Company shall fail to accept said plan within said period of ninety (90) days, or shall reject the same within said time or, after accepting the same, shall fail to enter upon the work in good faith, and prosecute the same as required in such ordinance, then the City may offer the right to construct

and operate said road under said terms and conditions to such other persons, company or corporation as may be willing to undertake the same: Provided, however, That any rights acquired by the Company under this section, and the section immediately preceding, shall be subject to all the terms and conditions of this contract with respect to a voice in the management, supervision of accounts, division of profits after the return of six (6) per cent upon the capital invested, and the right to ultimately acquire all the interest of the Company at the expiration of fifty (50) years from the date of this contract: And Provided, further, That in the case of the construction of new lines the capital necessary therefor shall, as far as practicable, be raised upon bond issues bearing the guarantee of the Company as to principal and interest, which bonds shall be issued in denominations of one hundred (100) dollars, five hundred (500) dollars, and one thousand (1000) dollars, and be offered to public subscription, but in no case shall they be sold for less than par; and to such extent as it may be impracticable to finance new enterprises upon bonds, or in case additional capital is needed for the purpose of extension, additions and betterments to existing lines, power or equipment, the same may be raised by an increase in the capital stock of the Company, but only with the express consent of the City, and all such increases shall be full paid at par in cash, and be subject to all the provisions herein contained with respect to the original thirty million (30,000,000) dollars of capital stock of the Company.

"Fourth.—The Mayor ex officio, and two citizens of Philadelphia, to be chosen from time to time by the Councils of said City, to serve for four years and until their successors are elected shall, as representatives of the City, be members of the Board of Directors of the Company, and, as such, exercise all the powers of Directors, and vote upon all questions which may come before the said Board with like effect as if they had been

duly elected directors of the stockholders of the Company, but without incurring any liability as directors, and the Company shall adopt such amendment to its By-Laws as may be necessary to give full effect to this provision.

"Fifth.—The Company shall, on or before the first day of October in each year, beginning in the year 1908, file in the office of the City Controller a full statement of its receipts and expenditures for the preceding fiscal year ending June 30th, and the City Controller shall thereupon examine the books, accounts and vouchers of the Company for said fiscal year for the purpose of ascertaining the correctness of the said reports, and report to Councils the result of such examination.

"Sixth.—The Company shall not declare or pay any dividend to its stockholders beyond a return of six (6) per cent per annum, cumulative from January 1, 1907, on the actual amounts of capital paid into the treasury in cash, calculated from the date of the several payments, without at the same time appropriating from earnings and surplus and paying into the City Treasury a sum equal to that portion of the total dividend which is in excess of the said six (6) per cent return, so that the City shall share with the stockholders equally and all net earnings properly distributable as dividends over and beyond a return of six (6) per cent per annum, cumulative from January 1st, 1907, upon the paid in capital stock of the Company.

"Seventh.—The Company as the owner of all of the capital stock of the Market Street Elevated Passenger Railway Company, in which Company is vested the right to build a subway on Broad street and an elevated railway to Frankford, does hereby covenant and agree that the said Market Street Elevated Passenger Railway Company will surrender and release to the City the right to build said subway on Broad street, which surrender the City does hereby accept; and the franchises to construct the said elevated railway to Frankford is hereby confirmed, and the time for the construction of the same

is hereby extended to three (3) years from the first day of June, 1907. Provided, however, That the building and financing of said road shall be under and subject to all of the conditions in paragraph three hereof; And Provided, further, That in case a subway on Broad street should hereafter be constructed by the City or by any other corporation, the Company shall make such arrangement relating to the construction and operation of the same around or under the City Hall, as may be agreed upon by a Board of Arbitration, one of whom shall be appointed by the City, one by the Company, and the third by the two so appointed, and the decision of any two shall be binding and conclusive on both parties.

"Eighth.—The City hereby confirms to the Company and its subsidiary companies all of the consent, rights and franchises heretofore granted to, and exercised by them, and each of them, including the right of operation by the overhead trolley system, free of all terms, conditions and regulations, not herein provided for, and does further give up and surrender and agree not to exercise any rights which it may possess in respect to a repeal or resumption of any of the said rights now possessed or heretofore granted, or a taking over of any of said properties, any law, ordinance or contract now in force, or hereafter passed to the contrary, notwithstanding: Provided, however, That the present rates of fare may be changed from time to time, but only with the consent of both parties hereto: and Provided, further, That nothing in this contract contained shall be construed to limit the power of the City to make all rules and regulations, relating to the operation and management of the lines controlled by the Company, necessary and proper to be made under the police power.

"Ninth.—In addition to the various payments to be made by the Company to the City as herein provided, the Company shall establish a sinking-fund to be in the custody and control of a commission composed of the Mayor of the City, the President of the Company, and

the President of the Board of Directors of City Trust, and make the following payments in the same, viz.: Beginning with the month of July, 1912, the payment shall be at the rate of ten thousand (10,000) dollars monthly for a period of ten (10) years, then at the rate of fifteen thousand (15,000) dollars monthly for a further period of ten (10) years, then at the rate of twenty thousand (20,000) dollars monthly for a further period of ten (10) years, then at the rate of twenty-five thousand (25,000) dollars monthly for a further period of ten (10) years, and finally at the rate of thirty thousand (30,000) dollars monthly for the balance of the term of this contract. These payments shall be treated by the Company as fixed charges reducing the income applicable to dividends to its stockholders and to the City; and no dividend shall be payable to the stockholders of distribution of surplus earnings made to the City as long as any such payment shall be in arrears. The said Commission in investing and reinvesting the money so raised shall be confined to the class of securities made by statute as proper investment for trustees; except that the stock of the Company may be purchased at a price not above par, and the bonds and underlying securities may be purchased on a four (4) per cent income basis and the Commission shall have the right to subscribe for stock or bonds issued under paragraphs two and three hereof. Any stock of the Company so acquired shall not be resold or reissued. The Commission shall, on or before the first day of October in each year after the establishment of said sinking-fund, file a full and accurate account of the said fund for the preceding fiscal year of the Company with the City Controller, who shall examine the books, accounts, securities and vouchers relating thereto and report to Councils the right of such examination. The City reserves the right at any time after the said fund may have reached the amount of five million (5,000,000) dollars to require by ordinance of Councils that the same shall be paid over to the City Treasury and become the

absolute property of the City, at the same time requiring a further payment towards said fund as provided for hereunder shall be made directly into the City Treasury.

"Tenth.—The Company shall, in addition to the other payments herein provided for, during the first full terms of ten (10) years next succeeding the date of this contract, pay into the City Treasury in each year the sum of five hundred thousand (500,000) dollars in cash; during the second full term of ten years next succeeding the date of this contract pay into the City Treasury in each year the sum of five hundred and fifty thousand (550,000) dollars in cash; during the third full term of ten years next succeeding the date of this contract pay into the City Treasury in each year the sum of six hundred thousand (600,000) dollars in cash; during the fourth full term of ten years next succeeding the date of this contract pay into the City Treasury in each year the sum of six hundred and fifty thousand (650,000) dollars in cash; during the fifth full term of ten years next succeeding the date of this contract pay into the City Treasury in each year the sum of seven hundred thousand (700,000) dollars in cash; all of which said annual payments shall be paid in equal monthly installments upon the last day of each month, which sums have been fixed, and which payments, when made, shall be in lieu and satisfaction of all obligations and liabilities on the part of the Company, and its subsidiary companies, for the paving, repaving and repair of the streets occupied by their surface lines, the obligation of the companies with respect to the removal of snow therefrom, and all license fees with respect to the cars that run upon said streets or over the various City bridges or the system of operating said cars, and shall be in lieu of the right of the City hereafter to impose upon the Company, or its subsidiary companies similar obligations or charges; but in case any additional streets shall hereafter be occupied by the Company by reason of additional surface lines or extensions made under the provisions of paragraphs two and three of this contract,

then the Chief of the Bureau of Highways, Department of Public Works, shall certify the number of square yards of street paving upon the streets so occupied and the character of such paving, there shall thereafter be added to the yearly sum to be so paid an amount equal to seven (7) cents per square yard of macadam pavement, and eight (8) cents per square yard of asphalt pavement, and six (6) cents per square yard of other character of pavement of said streets, or in case the Company should at any time with consent of the City abandon the use of any street then the Chief of Bureau of Highways, as aforesaid, shall certify the number of square yards of the various kinds of pavements upon the streets so abandoned, and the annual payment thereafter to be made shall be reduced in the same manner, at the rates named above. Nothing herein contained is intended to relieve the Company, or its subsidiary companies, from taxation upon any class of real estate now taxable, nor from taxation on dividends as provided in their respective charters, nor to affect the matters for which special provision has been made in this contract. To such extent, however, as taxes and assessments not upon such real estate or dividends may hereafter be imposed upon the Company for the benefit of the City, the City shall credit upon the taxes that may thus be hereafter imposed all payments made hereunder as well also as the sums which shall be divided with and paid to the City out of earnings as provided for in clause six: Provided, however, That nothing herein contained shall relieve the Company from the obligation to replace or repair pavement removed or damaged by any construction or repair work which the Company may undertake with reference to its tracks or conduits.

"Eleventh.—The City reserves the right to purchase all the property, leaseholds and franchises of the Company, subject to all indebtedness now existing or hereafter lawfully created hereunder upon July 1st, 1957, or upon the first day of any July thereafter by serving six months notice on the Company of its intention so to do, and upon

paying to the Company upon the date named in said notice an amount equal to par for its capital stock then outstanding, to wit: the thirty million (30,000,000) dollars of capital now authorized plus any additional capital stock issued with the consent of the City hereunder. The fund in the sinking-fund if not theretofore paid over to the City, shall be available to the City for the purpose of making or assisting in making the said payment for the property of the Company. This contract shall continue in force until such right is exercised, but whenever the right is exercised the City shall succeed to and become the owner, subject as aforesaid, of all the franchises, leaseholds, rights, property and privileges theretofore vested in the Company, and the City may either operate the same or lease the right to operate the same for such terms and upon such conditions as it may deem fit. The rights of the City under this paragraph shall be assignable and may be put up at public auction to the highest bidder therefor. The Company reserves its franchise to be a corporation with a power to operate passenger railway systems and may become a bidder for such rights.

"Twelfth.—Nothing in this contract contained, and no act lawfully done by the City hereunder, shall in any way render the City liable for any of the debts, obligations or liabilities of the Company, unless and until it shall exercise in the manner aforesaid its option of purchase, nor shall the credit of the City be pledged or loaned to the Company, nor shall it become a joint owner or stockholder in the Company, nor shall the payment to the City of a sum equal to the excess of dividends over and above six (6) per cent as hereinbefore provided, be in any way construed as making it a partner in the enterprise of operating the said system, but said payment is made upon the conditions of this agreement and is on account of the additional taxes, assessments and obligations which might otherwise be put upon the Company by or for the benefit of the City.

"Thirteenth.—Wherever hereunder the consent of the City is required it shall only be given by ordinance of Councils.

"Fourteenth.—All contracts, agreements and bonds existing between the City and the Company and its subsidiary companies are hereby superseded and cancelled, excepting only the agreement to contribute the sum of four hundred thousand (400,000) dollars to the City toward the expense of removing certain grade crossings, as provided in the Ordinance of March 28th, 1906, Phila. Ordinances, 42, and the agreement entered into under the Ordinance of April 16th, 1906, Phila. Ordinances, 86, with respect to the temporary removal of tracks on Twenty-first street, and the agreement entered into under the Ordinance of June 4th, 1906, Phila. Ordinances, 109, with respect to the postponement of the laying of tracks upon Broad street.

"Fifteenth.—This contract shall take effect as of July 1st, 1907, and one-half of any payment made by the Company for license fees for the current year shall be allowed as a credit against the first six (6) monthly payments provided for in paragraph ten hereof.

"In Witness Whereof, The parties caused these presents to be duly sealed and delivered as of, and to take effect the first day of July, 1907."

The court in an opinion by KINSEY, J., sustained the demurrers and dismissed the bill.

*Error assigned* was decree dismissing the bill.

*John McClintock, Jr.*, with him *A. Florence Yerger*, for appellant.—The act of 1907 is unconstitutional: Com. ex rel. v. Order of Vesta, 156 Pa. 531; Wilkes-Barre Hospital v. Luzerne County, 84 Pa. 55; Sharpless v. Phila., 21 Pa. 147.

A municipal corporation of Pennsylvania never had implied authority to become a stockholder in a private corporation: Penna. R. R. Co. v. Phila., 47 Pa. 189.

The city also loans its credit to the company, by having the mayor and two other citizens chosen by councils, "as representatives of the City," exercise all the powers of directors of the company: Sharpless v. Phila., 21 Pa. 147; Beeson v. Lang, 85 Pa. 197.

The ordinance and agreement of July 1, 1907, are not in compliance with the Act of April 15, 1907, P. L. 80. Their provisions far exceed the scope of said act: Purviance v. McClintee, 6 S. & R. 259; Edwards v. Tracy, 62 Pa. 374; Caldwell v. Miller, 127 Pa. 442.

The agreement is not executed in accordance with the Act of June 1, 1885, P. L. 37, requiring the approval of city solicitor and the countersignature of the controller: Smart v. Phila., 205 Pa. 329; Hepburn v. Phila., 149 Pa. 335; McManus v. Phila., 201 Pa. 619; Com. v. George, 148 Pa. 463.

*James Gay Gordon,* with him *Ellis Ames Ballard* and *John G. Johnson,* for appellee.

OPINION BY MR. JUSTICE BROWN, February 27, 1911:

By art. IX, sec. 7, of our constitution the general assembly is forbidden to "authorize any county, city, borough, township or incorporated district to become a stockholder in any company, association or corporation, or to obtain or appropriate money for, or to loan its credit to, any corporation, association, institution or individual." This clause, in substance, was, as is stated in Wheeler v. Phila., 77 Pa. 338, borrowed from the constitution of the state of Ohio, and, in Walker v. City of Cincinnati et al., 21 Ohio St. 14, the supreme court of that state, speaking through its chief justice, said: "The mischief which this section interdicts is a business partnership between a municipality or subdivision of the State, and individuals or private corporations or associations. It forbids the union of public and private capital or credit in any enterprise whatever. In no project originated by individuals, whether associated or

otherwise, with a view to gain, are the municipal bodies named permitted to participate in such manner as to incur pecuniary expense or liability. They may neither become stockholders nor furnish money or credit for the benefit of the parties interested therein. Though joint-stock companies, corporations and associations only are named, we do not doubt that the reason of the prohibition would render it applicable to the case of a single individual. The evil would be the same, whether the public suffered from the cupidity of a single person, or from that of several persons associated together. As this alliance between public and private interests is clearly prohibited in respect to all enterprises, of whatever kind, if we hold that these municipal bodies cannot do on their own account what they are forbidden to do on the joint account of themselves and private partners, it follows that they are powerless to make any improvement, however necessary, with their own means, and on their own sole account. We may be very sure that a purpose so unreasonable was never entertained by the framers of the constitution." All this is unquestionably true. What is forbidden by our constitution is (1) a municipality's becoming a stockholder in any company, association or corporation; (2) its obtaining or appropriating money for or loaning its credit to any corporation, association, institution or individual; and the first question to be considered on this appeal is whether the Act of April 15, 1907, P. L. 80, violates either of these inhibitions.

The act of 1907 is very brief and its provisions are free from all ambiguity. It provides that a municipality may enter into a contract with a street passenger railway company or motor power company leasing and operating the franchises and property of such other company within the municipal limits, for the purpose of fixing and regulating the franchises, powers, duties and liabilities of such companies and the rights of the respective contracting parties, and by such contract a municipality may,

inter alia, agree to accept from the company or companies fixed payments in lieu of the performance of certain duties or of license fees or charges imposed in favor of the municipality by general law or ordinance or by the charters of the respective companies. The municipality is further empowered to contract for the appointment of a certain number of persons to act as directors of the company or companies in conjunction with the directors elected by the stockholders thereof, and for the ultimate acquisition by it, upon terms mutually satisfactory, of the leaseholds, property and franchises of the contracting company or companies. An act of assembly is to be declared void only when it violates the constitution clearly, palpably, plainly and in such manner as to leave no doubt or hesitation in the mind of the court passing upon its constitutionality: Sharpless v. Phila., 21 Pa. 147. Tested by this rule, how can it be said that the act of 1907 is violative of the section of the constitution referred to? In its twenty-four lines there is not to be found a word or clause that can be tortured into the expression of legislative intent that a municipality may become a stockholder in any company, association or corporation, or obtain or appropriate money for or loan its credit to any corporation, association, institution or individual. The granting of a franchise to a street railway company or to a motor power company leasing and operating the franchises and property of the other company necessarily involves a contract or agreement with the municipality granting the franchises, for the purpose of fixing and regulating the same and defining the powers, duties and liabilities of the company and the respective rights of each of the contracting parties. This is all the first sentence of the act of 1907 provides for. The second empowers the municipality to contract for the payment to it by a street railway or motor power company of fixed sums in lieu of the performance of certain duties or of the payment of license fees or charges imposed in its favor by general law or ordinance or by the charter of

the leasing or operating company. This offends against nothing in the constitution. If, then, the legislature had the clear power to enact these provisions because not forbidden to do so, it follows as a corollary that it had the power to direct that a municipality, in making its contract with a street railway or motor power company, may, for the protection of its rights under the contract, provide that a certain number of persons shall act as directors of the company in conjunction with the directors elected by the stockholders thereof; and the final clause empowering the municipality to contract for the ultimate taking back of the franchises which it granted and for its acquisition of the leaseholds and property necessary to the exercise of the same is not a provision authorizing it to become a stockholder in a corporation or to appropriate its money for or loan its credit to a corporation. Nothing more need be said in support of the constitutionality of the act of 1907, and we pass to the second question raised by the appellant.

The preambles to the contract are but a recital of the conditions under which it was entered into by the parties to it. They set forth good reasons for its execution, and nothing appears in them in contravention of the constitution or as indicating a purpose on the part of the city to do anything in excess of the powers conferred upon it by the act of 1907. Passing from the preambles to the terms of the contract as they appear in its fifteen clauses, there is not to be found in any one of them a line which provides that during the period for which it is to run a dollar of the city's money, raised by taxation or otherwise paid into its treasury, is to be obtained by or appropriated to the Philadelphia Rapid Transit Company. The city does not, for any purpose whatever, assume any obligation or incur any liability and its credit is not involved, directly or indirectly, by the contract. During the term thereof the transit company must go on operating its franchises out of its own revenues, without being aided or having its credit strengthened to the extent of a penny by any

obligation or liability assumed by the city. If it succeeds, the success will be its own, and if it fails, the failure will be its own. As to this the contract is so. clear that the lay mind. cannot be misled in reading it. True, if the company shall so successfully operate its lines as to be able to declare dividends in excess of six per cent., the city will share in such excess, but its participation in such profits is, by the express terms of the contract, to be regarded "on account of the additional taxes, assessments and obligations which might otherwise be put upon the company by or for the benefit of the city." All the moneys which the city is to receive from the company are for lawful considerations passing from it to the company. This, too, plainly appears from the face of the contract. In this connection it is proper to say but a word in disposing of the contention of the appellant that, by the contract, the city becomes .a partner of the transit company. As just stated, what it may receive out of the profits of the company will be in consideration of its forbearance to do what it might lawfully do, and the company understands that it is thus paying for immunity to be extended to it. The city and the company could not become partners, for neither possesses the corporate power to enter into a partnership with anyone, and of this all the world must take notice in dealing with either. That there was no intention on the part of the city or the company of attempting to do what neither had the power to do clearly appears from the twelfth clause of the contract, which formed a part of the ordinance published and recorded for the information of the appellant and every other taxpayer in the city of Philadelphia. That clause is as follows and contains all that need be said on this branch of the case: "Nothing in this contract contained, and no act lawfully done by the city hereunder, shall in any way render the city liable for any of the debts, obligations or liabilities of the company, unless and until it shall exercise in the manner aforesaid its option of purchase, nor shall the

credit of the city be pledged or loaned to the company, nor shall it become a joint owner or stockholder in the company, nor shall the payment to the city of a sum equal to the excess of dividends over and above six (6) per cent. as hereinbefore provided, be in any way construed as making it a partner in the enterprise of operating the said system, but said payment is made upon the conditions of this agreement and is on account of the additional taxes, assessments and obligations which might otherwise be put upon the company by or for the benefit of the city."

It is argued that even if the act of 1907 is constitutional, the terms of the contract exceed the powers conferred by it upon the city, because the contract is with a motor power company operating some lines not within the city limits. This is straining the words of the act. The Philadelphia Rapid Transit Company has leased and operates a number of street railways "within the limits" of the city, and that it may have leased and now controls three lines beyond such limits does not affect the character in which it contracted with the city. Its chief lines are within the city, its main business is done there and, in contracting with the city, it did so as a company which had acquired, through stock ownership and leases, control of all the franchises which have been granted for the construction of surface, elevated and underground passenger railways within the city. The capacity in which it contracted was that given it by the act, and that its operations may extend beyond the city does not affect such capacity. The question now before us is not whether the city, at the expiration of fifty years, if it should exercise the option given it, can take over the railway systems beyond its limits, and, even if we should anticipate that it will then be held that it cannot do so, the whole contract is not, for that reason, to be set aside. The outlying railways beyond the city limits lead to the city, and, though of advantage to the transit company, are but incidental to its main business, which is

to operate street railways within the city limits. As to them it and the city had full power to make the contract, which is not void simply because the contracting parties may have included what, perhaps, ought to have been excluded. So far as they were able to contract their contract binds them, and its substance and general purpose are not affected by the interest which the transit company may have in the street railways beyond the city limits.

Another contention of the appellant is that the ninth clause of the contract is in violation of art. III, sec. 20, of the constitution, as it provides for a commission to invest the moneys of the city. The constitutional provision against which this clause in the contract is said to offend is that no power shall be delegated to a special commission to supervise the moneys belonging to a municipality. The ninth clause of the contract provides for the establishment of a sinking fund by the transit company, into which monthly payments are to be made, but the moneys in this fund, as established and increased from time to time, do not become the moneys of the city as soon as paid into it. The fund is the sinking fund of the Philadelphia Rapid Transit Company, and the moneys in it do not become the moneys of the city until, by a proper ordinance, after the fund reaches $5,000,000, the city shall require the same to be paid into its treasury. Then, and only then, does it become the absolute property of the city. In the interval the commission will have custody and control of the Rapid Transit Company's sinking fund, and the investments which it is authorized to make will be, if made, confined to securities authorized by statute as proper for trustees, except that the stock of the company may be purchased at a price not above par, and the bonds and underlying securities may be purchased on a four per cent. income basis. And we are unable to see how this is affected by sec. 22 of art. III of the constitution, which prohibits the legislature from authorizing the investment of trust funds by executors, administrators, guardians or other trustees in the bonds or stock of any private corporation, and agree

with the learned court below that, "While it is true that the city could not purchase such stock directly with the city's money, the said money is received from the company for the use of streets and as a release or in lieu of certain license fees, etc., and is to be held by a sinking fund commission for a length of time for a certain purpose. It is not, during the pendency of that uncompleted purpose, the money of the city, although it is provided that, by proper legal action, it may so become, whereupon it is to be paid immediately into the city treasury. The transaction is, as a whole, as may be gathered from the purport of the entire contract, a plan by which the company is made to pay the purchase price of its own property if the city should ultimately determine to take it over, and in the meantime the purchase money is to be held apart until it shall be utilized for that purpose, or paid into the city treasury." If the city should see fit not to exercise the option given it, the stocks and bonds purchased by the commission will be sold and the city will receive the moneys realized from their sale; but if, on the other hand, it should ultimately, in 1957, conclude to avail itself of the right given it under the contract to acquire all the property, leaseholds and franchises of the company, and art. IX, sec. 7, of our present constitution should still be in force, its acquisition of all the property of the transit company would not constitute it a stockholder of that company within the prohibition of the constitution. That prohibition was to prevent a municipality "from becoming jointly interested as stockholder with any company, association or corporation:" Wheeler v. Philadelphia, supra. This would not be possible if the city should acquire everything belonging to the transit company, for that company would then go out of business and practically die a legal death. This, in effect, is what happens whenever a municipality takes over the property and franchises of a water company in pursuance of statutory authority, but it has never been pretended that in so doing it becomes a stockholder in such company.

The only other question raised by the learned counsel for the appellant which requires notice is as to the failure of the city solicitor to approve the contract. By the second clause of the first section of art. VIII of the Act of June 1, 1885, P. L. 37, the city solicitor is required to prepare all contracts to be made with the city and to indorse his approval on them before they shall take effect. But this is not such a contract. The city councils themselves, by their ordinance, passed in pursuance of the powers conferred upon them by the act of 1907, made the contract, and, therefore, no approval of the city solicitor was required. As to this the learned judge below correctly said: "We do not consider it noteworthy or important that the city solicitor did not approve this contract, for the reason that so much of the act of 1885 as refers to the approval by the city solicitor seems to us to be limited to contracts made between various executive officers of the municipality and other parties, wherein the form must be approved and, indeed, drawn by the city solicitor; and the same reasoning applies to the objection of the non-approval by the controller. This contract was made in the form in which it was executed by councils itself. The latter bodies possess the power and discretion, and upon them falls the responsibility of making such contracts within the legal limitations allowed them, and when they have so acted, the city solicitor would have no right or authority to pass upon their work, unless so requested to do by proper authority, and, indeed, that could not affect the legality of an ordinance after the same had been duly passed."

Each ground of demurrer to the bill of complaint was well taken. The assignments of error are all overruled and the decree is affirmed at appellant's costs.

Mr. Justice Mestrezat dissents.