## Branch, Trustee, *v.* Kaiser et al., Appellants.

*Corporations—Insolvency—Impairment of capital—Illegal payment of dividends—Liability of directors—"Surplus" or "profits"— Act of May 23, 1913, P. L. 336.*

1. Directors of corporations are personally liable for payment of dividends in violation of the Act of May 23, 1913, P. L. 336, which

provides that dividends paid out of profits "shall in no case exceed the amount of the net profits acquired by the company so that the capital stock shall never be impaired thereby."

2. Where a corporation is insolvent without the fault of its officers or directors, but the directors, while the company is insolvent and its capital impaired, conceal its condition from the stockholders by false statements and inventories, and for several years pay dividends out of net profits which should have been applied to make up the impairment of capital, they will be personally liable to the company for the amount of such dividends so paid out.

3. In such case the earned profits reduced the impairment, and the declaration of the dividend again impaired the capital to the extent of dividends declared.

4. "Surplus" or "profits" denote an excess in the aggregate value of all assets of a corporation over the sum of its entire liabilities, including capital stock.

Argued December 6, 1927.   Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART and SADLER, JJ.

Appeal, No. 292, Jan. T., 1927, by defendants, from decree of C. P. No. 2, Phila. Co., Dec. T., 1926, No. 20031, for plaintiff, in suit of Clayton G. Branch, trustee in bankruptcy of Girard Grocery Company, bankrupt, v. Albert Kaiser et al.   Affirmed.

Bill to recover dividends illegally paid.   Before GORDON, J.

The opinion of the Supreme Court states the facts.
Decree for plaintiff.   Defendants appealed.

*Error assigned,* inter alia, was decree, quoting it.

*Franklin E. Barr* and *C. Berkeley Taylor,* with them *Romain C. Hasserick,* for appellants.—We have not been able to find any case which decides the question before the court.   All the cases disclose negligence and malfeasance of the officers and that the dividends were declared in whole or part out of capital: Penna. Knitting Mills v. Bayard, 287 Pa. 216; Cochran v. Shetler, 286 Pa. 226.

The most that can be said against these respondents is that they were guilty of a mistake of judgment, therefore no responsibility attached: Cornell v. Seddinger, 237 Pa. 389.

*B. K. Wolfe,* of *Aarons, Weinstein & Wolfe,* with him *Henry P. Brown, Fox & Rothschild* and *David Bortin,* for appellee.—The decree was proper: Cornell v. Seddinger, 237 Pa. 389; Loan Society v. Eavenson, 248 Pa. 407; Fell v. Pitts, 263 Pa. 314.

OPINION BY MR. JUSTICE FRAZER, January 3, 1928:

Defendants appealed from a decree entered by the court below on a bill in equity, filed by a trustee in bankruptcy, to compel repayment by respondents of moneys paid out as dividends alleged to have been wrongfully declared by the directors of the bankrupt corporation. Hearing was had in the court below by the court in banc on bill and answer.

The corporation in question, known as the Girard Grocery Company, was incorporated in 1908 under the laws of this Commonwealth, for the purpose of carrying on a wholesale business principally in groceries and food products. The stockholders were confined to retail grocers to whom the company sold goods, the business accordingly being carried on in the nature of a co-operative organization. The original capital was $175,-000, later increased to $1,000,000, divided into 10,000 shares of $100 each, of which there was issued and outstanding at the time of the bankrupt proceedings, stock to the aggregate value of $441,800. The business was prosperous from the start and by the year 1920 the corporation had accumulated a surplus of assets over liabilities of approximately $171,000, and for a number of years, up to 1920, had declared and paid dividends. In that year, however, it met with financial disaster, suffering a loss of $1,000,000, due, as claimed by respondents and admitted by the trustee, not to mismanage-

ment, neglect or wrongful practices on the part of the directors, but to a condition in the market for certain commodities, chiefly sugar and food products, which, to supply the demands of customers, it had bought outright and contracted for future deliveries, at the then prevalent high prices, but these suddenly enormously slumped, particularly sugar, large quantities of which the company had bargained for, in addition to immediate purchases, at prices ranging from 26 to 28 cents a pound, and which suddenly dropped to as low as 5½ cents a pound, entailing in this one item, a loss of $500,000. A similar amount was lost on purchases of food products. This occurrence culminated during the fiscal year of the company between July 1, 1920, and June 30, 1921. It was a post-war condition in the market which the directors could neither foresee nor prevent.

From inception of the corporation to its bankruptcy in 1926, respondents were continuously directors of the corporation, Kaiser being also president and Schoch holding the office of secretary.

It is averred in the bill of complaint, and not denied in the answer of defendants, that as a result of the $1,000,000 loss in 1920 the corporation became in fact insolvent and the capital wholly or in part impaired and dissipated. Up to 1920 the affairs of the company had been carried on prosperously and the heavy loss of that year was in nowise attributable to neglect, mismanagement or illegal practices on the part of the directors. At this point respondents, who had the active management and control of the business, committed error disastrous to them in every respect. Instead of acquainting the stockholders with the actual unstable financial condition of the corporation, for which they were blameless, facing the publicity of the unquestioned insolvency, of which they certainly had knowledge, and setting about for a legal adjustment of affairs, they deliberately adopted and put into practice a bold and reprehensible

system of deception, designed to conceal the insolvency from the stockholders and the public with the expectation of recouping, by means of future business, the loss of the $1,000,000 and thereby again place the company upon a sound financial standing. The situation was desperate, of course. There was practically no longer a surplus and a manifest impairment of capital existed.

Respondents exercised a practically exclusive supervision over and management of the company's business and financial transactions and in this situation appear to have experienced no difficulty in putting into effect their plans for an effective concealment of the loss of 1920 and to enable the company, as they hoped, to emerge financially rehabilitated from its troubles. These plans included false over-valuation of assets, refraining from notice of the $1,000,000 loss in their reports, a presentation of false annual statements, and a diversion into dividends of profits that should have been applied to lessening the capital's impairment. A summary of these practices will show the extent and method of their operations. Beginning with the close of the fiscal year of 1921, they made no record in the company's books of the $1,000,000 loss, gave no notice of it in their annual report and merely noted in that report a deficit of $22,-756.87. In addition, they presented inflated inventory sheets, giving to the actual merchandise the company had on hand a cost valuation, when in fact the value had enormously decreased. The same methods of concealment, misrepresentation and fictitious inventories were continued during the years down to and including 1925.

These methods and practices, as set forth in detail in the bill, are frankly admitted in respondents' answer, with the explanation, or excuse, that "the increase in the item of inventory was made with the intent and purpose of carying on the business of the said Girard Grocery Company for the benefit of its stockholders." It is doubtless true that such was the actuating motive impelling respondents to resort to their fraudulent mis-

representations and concealments, it was however a practice which safe and honest business methods will not support and which the law will not tolerate. Where acts of directors are of such nature that they directly and primarily affect the interests of stockholders in their shares of stock, by diminishing their value or otherwise injuring their rights, then the stockholders may sue to redress the wrong: Thompson on Corporations, section 1313.

Respondents, in the present case did not stop with these deceiving representations and false inventories; a situation additional to these was necessary to sustain appearance of solvency. Something of a more tangible and satisfying nature was necessary to hold down suspicion and prevent possible investigation. There still remained unused an exceptionally effective proceeding for that purpose, that of declaring and paying dividends. The expectation of respondents that there would be profits made by the company after the loss in 1920 was not unfounded. Profits were realized, and in 1922, while still concealing the corporation's loss, and continuing the inflating of inventories and furnishing falsifying statements, with the organization in actual insolvency, a meeting of the directors was held, attended by respondents, at which a dividend was declared, followed by similar action in the succeeding years, down to and including 1925, the total amount thus paid out in dividends being in excess of $132,000. The payments of these annual allotments, out of current profits, is admitted by respondents and justified by them on the ground that in the years of the payments, profits were realized from the business of the company and that the distributions were made out of profits accruing after the insolvency of 1920.

Nowhere in the record does it appear that the total of these profits, which respondents claim was in excess of the total of the dividends paid out, would have materially lessened the existing impairment of the capital,

had they been so applied. Nevertheless, the only proper and rightful use of these several amounts, was to apply them, so far as they went, to the reduction of that deficit, and hence their application to the payment of dividends was, under the situation, clearly unjustifiable and illegal. There were in fact no profits or surplus, out of which alone dividends could be declared, available to these respondents for use as distribution payments. "Surplus" or "profits" denote an excess in the aggregate value of all assets of a corporation over the sum of its entire liabilities, including capital stock: Edwards v. Douglas, 269 U. S. 204. Clearly in the present case the profits made, totalling over $132,000, were not sufficient to constitute a surplus over the sum of all aggregate liabilities of the Girard Grocery Company. The insolvency brought about by the million dollar loss in 1920 had not been lifted and the reduced capital was never replenished. These profits should have been applied to the depleted capital, and, so appropriated, there would have then remained no funds out of which to legally pay dividends. With the exception of distributions made in liquidation, dividends can be declared and paid out of net profits only, or conversely stated, when the payment does not impair the capital stock of the corporation. Nor can an insolvent corporation declare and pay a dividend, and if the capital stock has been impaired by the payment of the dividend, it is nevertheless unlawful, although the corporation is solvent at the time: 14 C. J., page 800. Hence the absolute and legal duty of respondents, knowing a serious impairment of the capital existed, was to devote the profits here mentioned to the betterment of the company's shattered financial condition, instead of suppressing their wrongful management of its affairs and lulling suspicion on the part of stockholders by doling the accumulations out in the shape of dividend payments. In this connection we may adopt the conclusions of the learned court below, as follows:

"It is argued by counsel for the respondents that the impairment of the capital occurred prior to the declaration of the dividends in question, and all that the directors did was to fail to reduce an impairment that existed. This argument overlooks the fact, however, that by declaring the dividends each year out of current profits, the directors illegally diverted funds which properly were applicable to a reduction of the capital deficit. The earned profits, therefore, reduced the impairment, and the declaration of the dividend again impaired the capital to the extent of the dividends declared."

In our opinion, we need not enter further into this discussion. It is undisputed that respondents by illegal methods made and continued concealment, from both the stockholders of the company and the public, of the precarious financial standing of the corporation, repeatedly inflating inventories of goods on hand, thus presenting a fraudulent over-valuation of assets, and, lastly, declared dividends, at the time the corporation was insolvent and its capital seriously depleted and impaired, out of profits that should have been used for its stabilization. The court below found the disbursements were illegal, under the Act of May 23, 1913, P. L. 336, and that the directors are personally liable for the dividends so declared. We concur in that judgment.

The decree of the court below is affirmed at appellants' costs.